# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00660-CR

**Christian Lozano, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 403RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-23-904023, THE HONORABLE BRANDY MUELLER, JUDGE PRESIDING

## O P I N I O N

Christian Lozano was charged with one count of indecency with a child by sexual contact and three counts of sexual assault of a child.[1] *See* Tex. Penal Code §§ 21.11, 22.011. The alleged victim in all the counts was Lozano's daughter A.L., who was alleged to have been younger than seventeen years old at the time of the offenses.[2] The jury found Lozano guilty of all four counts and sentenced him to twenty years' imprisonment in each count, and the trial court rendered its judgments of conviction consistent with those verdicts. *See id.* § 12.33. In three issues on

---

[1] Originally, Lozano was also charged with three counts of prohibited sexual conduct with a descendant and two other counts of sexual assault of a child. *See* Tex. Penal Code §§ 22.011, 25.02. The State abandoned the prohibited-conduct charges at the start of trial and waived the two sexual-assault counts during the guilt-innocence phase.

[2] Because A.L. was a minor at the time of the alleged offenses, we will refer to her by a pseudonym and to her family members by their relationships to her. *See* Tex. R. App. P. 9.8, .10 (defining sensitive information).

appeal, Lozano asserts that the trial court erred by admitting into evidence thirty-three of the State's exhibits, that the jury charge for the guilt-innocence phase contains reversible error, and that the cumulative harm stemming from these errors requires reversal. We will affirm the trial court's judgments of conviction.

## BACKGROUND

In 2014 or 2015, when she was fourteen years old, A.L. decided to move out of Mother's home due to Mother's substance-abuse issues. A.L. moved into a home with her father, Lozano; his wife (Stepmother); and their two children. A.L. did not have her own room at this house, and she slept on a couch in the living room. In November 2015, the family moved to a new home, which had enough bedrooms for all the children and a guestroom on the first floor that was separated from the other bedrooms in the house. At the new house, Lozano kept musical equipment and some of his other belongings in the garage where he spent a great deal of his time. The garage also had a futon.

In 2021, when A.L. was twenty-one years old, A.L. abruptly moved out of the home and back in with Mother. Shortly after moving back, A.L. told Mother that Lozano had sexually abused her. Mother drove A.L. to the police station, and A.L. informed the police that Lozano had been sexually abusing her for years. The police arranged for A.L. to be examined by a sexual-assault nurse examiner ("SANE").

Additionally, A.L. forwarded to the police email exchanges between Lozano and her, and she allowed the police to search her phone. Further, the police obtained a search warrant for Lozano's phone. While searching the phones, the police discovered email and text exchanges

2

between Lozano and A.L. and discovered internet searches performed by Lozano in August 2021, after A.L. moved out.

Around the same time that A.L. began talking with the police, Stepmother cleaned A.L.'s room and found a journal belonging to A.L. in which A.L. wrote about sexual activity involving Lozano and her. After finding the journal and reading its contents, Stepmother moved out of the house with her two children. Stepmother then called the police to report what she found in the journal and told Lozano that she had moved out of the house because of what she found in the journal. Lozano denied any wrongdoing in a series of text messages from August 2021 and instead told Stepmother that A.L. had been fantasizing about being in a relationship with him, that she had sent him sexually themed emails that he had not asked for or responded to, that A.L. was lying about them having a sexual relationship, and that he found bizarre writings by A.L. in her bedroom that he burned. In those text exchanges, Lozano attached emails that A.L. had sent to Lozano. When Lozano finished sending the text messages, Stepmother forwarded to the police the text exchanges and attachments and gave the police the journal she found.

Following the police investigation, Lozano was arrested and charged with indecency with a child and sexual assault of a child. During the trial and before A.L. testified, two law-enforcement officers testified regarding their investigation, and the SANE testified that A.L. told the SANE that Lozano began sexually abusing her when she was fifteen years old and that the abuse progressed to oral, vaginal, and anal penetration.

In her testimony, A.L. mentioned her birthdate and explained that she began living with Lozano when she was fourteen years old and that Lozano began sexually abusing her shortly after she moved in. Regarding one incident at the first house where she lived with Lozano, A.L. recalled that she fell asleep in the primary bedroom while Stepmother was at work, that she woke

up to feeling Lozano's right hand rubbing her vagina on the outside of her underwear, that she noticed that he was masturbating with his other hand, that she froze at first, that she later rolled over and went to the living room, and that Lozano followed her and yelled at her for leaving. A.L. explained that similar incidents occurred when they lived at the first house where she did not have a bedroom, that the first incident occurred when she was fourteen years old, and that they moved to the second house when she was a sophomore in high school. A.L. admitted that she had difficulty recalling the details of the incidents but stated that she had a stronger recollection of what happened at the second house.

Regarding the second house, A.L. testified that incidents occurred in the garage, her bedroom, the guest bedroom, and the primary bedroom. In particular, she explained that after they smoked marijuana, Lozano "would make me give him oral" until he ejaculated in her mouth; that Lozano would get angry if she did not agree to perform oral sex; that Lozano sometimes used physical force; and that she performed oral sex on Lozano many times throughout her "entire high school career" in the garage, her room, the guest room, and the primary bedroom. A.L. mentioned how Lozano stopped engaging in sexual conduct with her in the primary bedroom because Stepmother came home early once and almost caught them. Next, A.L. testified that Lozano inserted his penis into her vagina in the garage, in the guest room, and in her room and would ejaculate on her back. A.L. clarified that Lozano penetrated her mouth and her vagina with his penis while she was a sophomore, junior, and senior and after she graduated and that she was fourteen years old for most of her freshman year, fifteen years old for most of her sophomore year, and sixteen years old for most of her junior year. A.L. mentioned that she told Lozano to stop many times and that Lozano told her that she must have liked what he was doing because she did not run away. Concerning one incident in the guest room, A.L. testified that she told Lozano to

4

stop inserting his penis into her vagina because it hurt, that Lozano did not stop, that she pulled away to stop the penetration, and that Lozano began yelling at her. When discussing why she did not leave sooner, A.L. explained that Lozano made her feel as though she had nowhere else to go.

In her testimony, A.L. explained that when Lozano would text her to meet in the garage, that was code for his wanting oral and vaginal sex. Further, she related that if she did not respond to the text messages, he would come to her bedroom and penetrate her there. Additionally, she revealed that she would send Lozano pictures of herself in the hopes that the pictures would be enough to satisfy him without his demanding sex. Further, A.L. related that she wrote in journals while living with Lozano and that Stepmother found one of her journals. Regarding what led to her moving out, A.L. stated that she did not respond to Lozano's directive to meet him in the garage, so he yelled at her and took her cellphone and laptop. Further, A.L. recalled that after finding where Lozano stashed her phone and computer, she packed up more of her belongings and went to Mother's house when Lozano was distracted and never went back to Lozano's house.

A.L. testified that the first person she talked to about the abuse was her friend in 2019 but that she asked her friend not to say anything. A.L. told her then boyfriend about the abuse in 2021 and told Mother after she moved out of Lozano's home, but A.L. stated that she did not go into detail with Mother. Next, A.L. admitted that she had the passcode to Lozano's phone, but she denied accessing his email or making messages pretending to be Lozano.

In her cross-examination, A.L. admitted that she had previously lived with Lozano when she was younger and that no abuse occurred during that time. Further, she agreed that Lozano and she would make music and play instruments while in the garage, that Lozano would ask her to go to the garage to retrieve tools, that she wrote a goodbye note on the day she moved out of Lozano's home, and that she did not mention the abuse in that letter. Further, she admitted

5

that she would use Lozano's phone occasionally to play a song or log into her social media accounts and that she knew Lozano's passcode; however, she explained that she would not use the phone for long because she had her own phone and denied sending content from Lozano's phone to her phone.

In her testimony, A.L. agreed that emails, text messages, and images collected by the police were from exchanges between Lozano and her and revealed that she forwarded many of the messages to the police. During her testimony, the trial court admitted multiple sets of exhibits, and Lozano objected to many of them. The first was exhibit 29, an email exchange between Lozano and A.L. when she was younger than seventeen in which she sent photos of herself in a swimsuit outside. Exhibits 30 and 33 to 50 were emails over a four-year period between Lozano and A.L. after she turned seventeen in which A.L. sent photos of herself naked or in a swimsuit or in lingerie to which Lozano responded, including one response where Lozano sent a photo of either his penis or another adult man's penis.

The next group of exhibits admitted into evidence were exhibits 56 to 62. The first five exhibits were screen shots of the email history between Lozano and A.L. from April 2016 to July 2020. A.L. was younger than seventeen for some of those exchanges. The next two exhibits were an email exchange between Lozano and A.L. from April 2017 in which she sent a photo of herself in a bathing suit and in which Lozano asked for additional photos.

Additionally, the trial court admitted exhibits 70 to 120, which were text messages between A.L. and Lozano from July 2020 to May 2021, which was after A.L. turned seventeen but before she moved out. The next set of exhibits admitted were exhibits 51 to 55 and 121. Exhibits 51 to 55 were emails sent by Lozano to A.L. after she turned seventeen and shortly after she moved

6

out. Exhibit 121 contained numerous text messages sent by Lozano to A.L. after she moved out in which he initially apologized for how he treated her but later threatened her.

After A.L. testified, one of the investigating officers testified and described obtaining a search warrant to take a photo of Lozano's pubic region after A.L. mentioned seeing a mole in the area, and the officer testified that a mole was in the area described by A.L. A photo of the mole was admitted into evidence. During the officer's testimony, the trial court admitted three pages from the journal Stepmother found in A.L.'s room and gave to the police. The journal entry was dated June 18, 2019, which was after A.L. turned seventeen. In her journal, A.L. described feeling unbalanced and stated the following: "No one can know my secret. The other night dad got mad at me again. For not taking initiative. He wants me to sit on his dick and make it 'fun.' But I do not want fun. I want my daddy. I want my dad back." A.L. also wrote the following: "If I wasn't so promiscuous, maybe he wouldn't have seen anything in me. Maybe he wouldn't see any attraction in me and he'd treat me like [her younger sister], a daughter. And I have asked him once, please let's stop. He thought I was just saying that 'to get out of it.'"

Once the officer finished testifying, a forensic analyst testified regarding the search that he performed on Lozano's phone and testified regarding searches that were performed on Lozano's phone in August 2021 after A.L. moved out. More specifically, the analyst explained that the phone had been used to watch a pornographic movie with the description "cute young nerdy tiny teen stepdaughter fucked by creepy stepdad." During the analyst's testimony, the trial court admitted exhibit 65, which was a list of the internet searches performed on Lozano's phone over a three-day period and showed that the phone performed thirty-one searches for pornography with similar descriptions.

7

Next, Stepmother testified that she found A.L.'s journal after A.L. moved out of the home, that she confronted Lozano after she moved out of the house with her children, and that Lozano denied engaging in any sexual behavior with A.L. and instead told Stepmother that A.L. was obsessed with him and would send him unsolicited sexual images. During Stepmother's testimony, the trial court admitted exhibits 68 and 68A through 68W, which were text messages between Lozano and Stepmother after Stepmother confronted Lozano. In those exchanges, Lozano denied any wrongdoing and, as support, forwarded to Stepmother communications that A.L. had sent to Lozano, including photos, but omitted the portions of the exchanges in which he responded to A.L. or initiated similar communications.

Following Stepmother's testimony, A.L.'s friend that she met in middle school testified that she had a serious conversation with A.L. in 2019 after A.L. had been living with Lozano but that A.L. begged her not to say anything about what A.L. disclosed. The friend did not provide any details regarding that conversation during her testimony. In her cross-examination, the friend recalled telling A.L. not to live with Lozano anymore after hearing A.L.'s disclosure about what had been happening at the house but that A.L. said that she would continue to live with Lozano and gather evidence about what had been happening.

The State's final witness was Dr. Stephen Thorne. In his testimony, Dr. Thorne discussed how children can be groomed for abuse and how children might never report abuse or might delay disclosing for a variety of reasons, including fear, shame, guilt, and love.

In his case-in-chief, Lozano called his mother ("Grandmother") to the stand, who testified that A.L. lived with her temporarily in 2019 after Lozano and Stepmother became frustrated with A.L.'s not helping around the house and not going to school. Grandmother related

8

that A.L. made no outcry of abuse to her, that she never saw any interactions between A.L. and Lozano that concerned her, and that A.L. hated Mother.

After considering the evidence presented at trial, the jury found Lozano guilty of the charged offenses. During the punishment phase, the State called Stepmother to the stand, who testified that she had filed for divorce, that Lozano verbally abused her and their son, and that right after she gave birth to their youngest child, Lozano had sex with another woman in their house. In addition, Stepmother discussed how A.L. had recorded a conversation between Lozano and A.L. in which Lozano threatened A.L. During Stepmother's testimony, the trial court admitted into evidence exhibit 123, which was a recording of the conversation.

When making his case, Lozano called as witnesses Grandmother and his friend Anthony Simmons. Grandmother testified that Lozano lives with her now, that he helps her around the house, and that she has no one else to help her. Additionally, Grandmother stated that Lozano was working and paying child support. Lozano's friend Simmons testified that Lozano helps his family members and friends, including Grandmother and Simmons. Further, Simmons characterized Lozano as a great father who was there for his children. However, Simmons conceded during his cross-examination that sexually abusing someone is bad and that doing so more than once is even worse.

After considering the evidence, the jury sentenced Lozano to twenty years' imprisonment in each count.

Lozano appeals the trial court's judgments of conviction.

**DISCUSSION**

In his first issue on appeal, Lozano challenges five separate evidentiary rulings made by the trial court.[3] Specifically, Lozano contends that the trial court erred by overruling his Rule 404 and 403 objections to the admission of exhibits 30 and 33 through 50, which were email exchanges between Lozano and A.L.; overruling his Rule 403 objection to the admission of exhibits 51 through 55, which were emails Lozano sent to A.L.[4]; overruling his Rule 403 objection to the admission of exhibits 56 through 62, which were photos of the email history between Lozano and A.L. and an email exchange between them[5]; overruling his Rule 403 objection and admitting

[3] In its brief, the State contends that Lozano's first issue is multifarious and should be rejected because it challenges different evidentiary rulings on different grounds. *See Davidson v. State*, 249 S.W.3d 709, 717 n.2 (Tex. App.—Austin 2008, pet. ref'd). Although the State correctly points out that Lozano is challenging different rulings for different reasons, each ruling is addressed in a separate section of the first issue, and we will address these separate arguments in the interests of justice. *See id.* (explaining that appellate courts "may consider multifarious issues if [they] can determine, with reasonable certainty, the alleged error about which the complaint is made").

[4] In his second and third sets of arguments, Lozano mentions that he also objected to the admission of these exhibits on the ground that they constituted inadmissible evidence of extraneous conduct, but he does not in either section of his brief assert that the trial court erred by denying his objection or present argument pertaining to that objection. *See* Tex. R. App. P. 38.1.

[5] In its brief, the State also argues that Lozano failed to preserve for appellate consideration the first three sets of arguments in his first issue. *See* Tex. R. App. P. 33.1. During a hearing held outside the presence of the jury, the State indicated that it intended to offer in groups the following exhibits: (1) exhibits 30 and 33 through 50; (2) exhibits 51 through 55; and (3) exhibits 56 to 62, although the State initially referred to this last group by a description rather than by exhibit numbers. The State conceded that the exhibits pertained to extraneous acts. In response, Lozano objected to the admission of all the exhibits as impermissible extraneous offense evidence, challenged the relevancy of the evidence by asserting that the exhibits pertained to acts "outside the reasonable time frames" of the allegations, and argued that the admission would be "prejudicial more than actually proving the alleged incidents during the time frame." In response, the State argued that the exhibits were admissible under article 38.37 of the Code of Criminal Procedure. Later during the hearing, Lozano referenced multiple times his prior objections, and the trial court determined that the evidence pertaining to the first group could be admitted under article 38.37, that it could be admitted to prove intent as allowed under Rule 404, and that the probative value

10

exhibit 65, which was the report showing internet searches performed on his phone; and overruling

his authentication objection to the admission of exhibit 123, which was a recording of a purported

conversation between A.L. and him. In his second issue, Lozano asserts that the jury charge for

the guilt-innocence phase contained an error that egregiously harmed him. Finally, in his third

issue, Lozano contends that the cumulative effect of the errors he asserts occurred at trial

warrant reversal.

## Standard of Review and Governing Law for First Issue

Appellate courts review a trial court's ruling regarding the admission or exclusion

of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim.

App. 2011). Under that standard, a trial court's ruling will only be deemed an abuse of discretion

if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*,

86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*,

153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that

the trial court's decision "is reasonably supported by the record and is correct under any theory of

law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In

addition, an appellate court reviews the trial court's ruling considering the record before the court

---

was not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 103(b) (explaining that when court hears objection outside presence of jury and rules that evidence is admissible, party need not renew objection to preserve claim for appeal). When discussing the third group during the hearing and when the trial court admitted the second and third groups into evidence, Lozano again referenced his "prior objections" specified above before the trial court admitted those groups as well. *Maibauer v. State*, 968 S.W.2d 502, 505 (Tex. App.—Waco 1998, pet. ref'd) (finding trial court implicitly overruled objection by admitting evidence). On this record, we will assume that Lozano preserved for appellate consideration the claims that are addressed in the portions of the opinion addressing his first three sets of arguments. *See* Tex. R. App. P. 33.1; *see also Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997) (noting that appellate courts presume trial court conducted Rule 403 analysis when Rule is invoked).

"at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

Two Rules of Evidence governing the admission of evidence are Rules 404 and 403. *See* Tex. R. Evid. 403, 404. Rule 404(b) provides that extraneous-offense evidence "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b). "Rule 404(b) . . . is a rule of inclusion rather than exclusion," *Chaparro v. State*, 505 S.W.3d 111, 115-16 (Tex. App.—Amarillo 2016, no pet.), and the "enumerated exceptions" listed under Rule 404(b) "are neither mutually exclusive nor collectively exhaustive," *Torres v. State*, 543 S.W.3d 404, 420 (Tex. App.—El Paso 2018, pet. ref'd). Accordingly, courts have explained that "extraneous-offense evidence, under Rule 404(b), is admissible to rebut a defensive theory raised in an opening statement or raised by the State's witnesses during cross-examination." *Bargas v. State*, 252 S.W.3d 876, 890 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). "An extraneous offense may be admissible to prove the culpable mental state required for the charged offense if the required intent cannot be inferred from the act itself, or if the accused presents evidence to rebut that inference." *Sandoval v. State*, 409 S.W.3d 259, 299 (Tex. App.—Austin 2013, no pet.). The admission of extraneous-offense evidence to show intent is proper if the defendant contradicts the State's evidence showing intent or undermines the State's evidence during cross-examination of the State's witnesses. *See id.* In general, a trial court's ruling admitting evidence under Rule 404(b) is within the zone of reasonable disagreement if the evidence shows that "an extraneous transaction is relevant to a material, non-propensity issue." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Although Rule of Evidence 404 deals with the admission of extraneous offenses, the legislature promulgated a statute governing the admission of extraneous offenses in cases involving sexual offenses committed against children, including sexual assault and indecency with a child. *See* Tex. Code Crim. Proc. art. 38.37. That provision states in pertinent part as follows:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:
>
> (1) the state of mind of the defendant and the child; and
>
> (2) the previous and subsequent relationship between the defendant and the child.

*Id.* art. 38.37, § 1(b); *see Harris v. State*, 475 S.W.3d 395, 402 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (noting that article 38.37 recognizes that evidence permitted under that statute is "propensity or character evidence and that it is admissible notwithstanding those characteristics" because legislature determined that this additional exception was necessary due to heinous nature of crimes at issue and importance of protecting children from sexual predators).

"An evidentiary statute trumps a rule of evidence adopted by the courts," and by its terms, article 38.37 "supersedes in certain sexual abuse cases the application of Texas Rule[] of Evidence . . . 404." *Hitt v. State*, 53 S.W.3d 697, 704, 705 (Tex. App.—Austin 2001, pet. ref'd). Accordingly, "article 38.37 of the Texas Code of Criminal Procedure expands the admissibility of extraneous acts evidence in trials involving certain offenses committed against a child under seventeen years of age." *Jones v. State*, 119 S.W.3d 412, 419 (Tex. App.—Fort Worth 2003, no pet.) (construing former section 2 of article 38.37, which has been moved to section 1 of current version of article 38.37); *see* Act of May 28, 1995, 74th Leg., R.S., ch. 318, § 48, art. 38.37, 1995 Tex. Gen. Laws 2734, 2748 (amended 2005, 2011, 2013, 2021, and 2023).

13

Rule of Evidence 403 specifies that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (footnotes and internal quotation marks omitted). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (internal citation omitted).

Although this is not an exhaustive list, courts generally balance the following factors when performing a Rule 403 analysis: "(1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *see Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). In this context, "probative value" refers to how strongly evidence makes the existence of a "fact of consequence" "more or less probable" and to how much the proponent needs the evidence, and "[u]nfair prejudice" refers to how likely it is that the evidence might result in a decision made on an "improper basis," including "an emotional one." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (quoting *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)).

**Admission of Exhibits 30 and 33 through 50**

In his first issue, Lozano presents several sets of arguments attacking the admission of different sets of exhibits. First, Lozano argues that the trial court erred by admitting State's exhibits 30 and 33 through 50 during A.L.'s testimony. These nineteen exhibits contained email exchanges between A.L. and Lozano that were sent between April 2017 and February 2021, which was after A.L. had turned seventeen but before she moved out of Lozano's home. In most of the exchanges, A.L. sent photos of herself in a bathing suit or in lingerie, and some of the photos were close-up shots of her pubic region or buttocks. Additionally, she sent photos where her breasts were exposed. In one exchange, Lozano forwarded to A.L. an email that he previously sent to another one of his email accounts, and the email included images of A.L. in a bathing suit that A.L. sent to Lozano in April 2016 when she was sixteen years old.

The exchanges also included some responses from Lozano. In one exchange, Lozano sent an image of an erect penis being held by a hand. In response to one email in which A.L. sent Lozano a link to certain photos with the subject line "I love you—invitation to view," he responded as follows:

> I can't see until you give me access. I think it sent you a request.
> Can't wait to see\u.
> I love you so much [A.L.]. Suck a butt! Jk.

When responding to an email containing a picture of A.L.'s uncovered breasts, Lozano stated the following: "Fucking hot . . . more plz . . . . plz plz plz!." In another email from Lozano to A.L., he sent her a photo of bodily fluid stains on a mattress. On the same day that A.L. sent Lozano a picture of herself in lingerie, he emailed her the following:

15

Almost unbelievable. . .

Beautiful isn't the word that fits because in all seriousness.  Speechless . . .

Rare kind of beauty.

I feel lucky even being close to you.

You are a dream kinda chic boogie, no joke!

I know beauty, I also know you are far above that.  Again . . . no words.

Just amazing comes to mind.

Love you.

Ps. And most of all thank you for trusting me.

*Rule 404(b) and Article 38.37*

Initially, Lozano contends that the exhibits should not have been admitted under Rule of Evidence 404(b).  However, as set out above, article 38.37 applies to the admission of extraneous offenses in cases like this one and expands admission beyond the directives of Rule 404.  *See Hitt*, 53 S.W.3d at 705.  Accordingly, we will first address whether the evidence was admissible under article 38.37.  *See Carrasco*, 154 S.W.3d at 129.

When asserting that these exchanges should have been excluded, Lozano states that only one of the exchanges included images from when A.L. was younger than seventeen years old but asserts that even for that exchange, the email itself was sent after she had turned seventeen years old.  Because both types of offenses for which he was charged required proof that the victim was "younger than 17 years of age," *see* Tex. Penal Code §§ 21.11, 22.011(a)(2), (c)(1), Lozano argues that these communications could not constitute criminal activity and, therefore, have no bearing on the elements of the offenses for which he was charged.  Next, Lozano argues that the evidence should not have been admitted because at least some of the exchanges do not implicate

16

a wrong or bad act and that even those that were sexual in nature did not "necessarily implicate sexual activity."

One sister court of appeals rejected an age-out argument like Lozano's here in which the defendant argued that article 38.37 did not authorize the admission of evidence of extraneous acts occurring after the victim turned seventeen years old. *See Pool v. State*, 981 S.W.2d 467 (Tex. App.—Waco 1998, pet. ref'd). Our sister court determined that conduct occurring after the victim turned seventeen years old bore "directly on the 'subsequent relationship'" between the defendant and the victim and explained that it found "no requirement in the statute that the 'victim of the alleged offense' be under seventeen years of age at the time the 'other crimes, wrongs, or acts' were committed." *Id.* at 469; *see Flores v. State*, No. 13-12-00362-CR, 2013 WL 3326982, at *4, *5 (Tex. App.—Corpus Christi-Edinburg June 27, 2013, no pet.) (mem. op., not designated for publication) (agreeing with reasoning of *Pool* and concluding that evidence of "sexual advances toward" child victim after she reached age of majority bore on subsequent relationship between defendant and victim and was, therefore, properly admitted); *see also Smith v. State*, 352 S.W.3d 55, 71 (Tex. App.—Fort Worth 2011, no pet.) (explaining that if legislature intended to include things in statute, it could have done so).

We agree with the analysis by our sister court and similarly conclude that the text exchanges between A.L. and Lozano after she turned seventeen years old were relevant under article 38.37 to Lozano's and A.L.'s states of mind and to the previous and subsequent relationship between them. *See* Tex. Code Crim. Proc. art. 38.37, § 1(b); *see also McCulloch v. State*, 39 S.W.3d 678, 681 (Tex. App.—Beaumont 2001, pet. ref'd) (concluding that evidence of sexual abuse by defendant against child victim after alleged offense was admissible under article 38.37

17

because it showed defendant's intention and ability to commit offense and revealed nature of relationship between two parties).

Additionally, although the exchanges did not include photos showing sexual contact or behavior between Lozano and A.L., the language used in the messages as well as the photos sent from both parties indicated that an improper sexual relationship continued after A.L. reached the age of majority. *See* Tex. Penal Code § 25.02 (providing that person commits offense by engaging in sexual relationship with actor's descendant); *see also Anderson v. State*, No. 03-23-00649-CR, 2024 WL 3941066, at *2, *4 (Tex. App.—Austin Aug. 27, 2024, no pet. h.) (mem. op., not designated for publication) (noting that post-incident text messages to victim bore on whether defendant committed sexual offense against victim); *Walker v. State*, 4 S.W.3d 98, 103 (Tex. App.—Waco 1999, pet. ref'd) (determining that evidence of extraneous acts against victim "had direct bearing" on previous and subsequent relationship between victim and defendant).[6]

For these reasons, we conclude that the trial court did not abuse its discretion by admitting under article 38.37 the email exchanges contained in exhibits 30 and 33 to 50. *See* Tex. Code Crim. Proc. art. 38.37.

---

[6] In this issue, Lozano refers to the State's notice of intent to introduce outcry statements that A.L. made to several individuals and argues that the notice demonstrates that A.L. provided inconsistent statements regarding whether the indicted conduct occurred before or after she turned seventeen years old. However, that notice was not introduced into evidence, and it is unclear what significance the notice could have on the trial court's evidentiary ruling at issue made during trial based on evidence that had been presented. *See Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.). Moreover, we note that Lozano asserts in this issue that he is not presenting a sufficiency challenge to the evidence supporting his conviction.

*Rule 403*

In this issue, Lozano also contends that the exhibits should have been excluded under Rule 403. *See* Tex. R. Evid. 403.

*Probative Value*

When asserting that the trial court should have sustained his Rule 403 objection, Lozano first argues that the messages in the emails did not "prove a consequential fact." As set out above, the exhibits were relevant to establishing Lozano's state of mind, including his state of mind at the time of the alleged offenses, and the nature of the relationship between Lozano and A.L. *See* Tex. Code Crim. Proc. art. 38.37, § 1(b). The exhibits showed that Lozano engaged in a continuing course of conduct in which he participated in sexually-charged messages with his daughter A.L. from when she was seventeen years old up until she moved out of his house, that he wanted her to continue sending nude or partially clothed pictures of herself to him, and that in response to her photos he sent either an image of himself masturbating or an image of another man masturbating.

Further, Lozano presented his defensive theory in his opening statement that the abuse did not occur, that A.L. made up the allegations because she was angry at Lozano for having two other children with Stepmother, and that she fabricated evidence on Lozano's phone. As discussed above, evidence of extraneous acts can be admitted to rebut a defensive theory, *Bargas*, 252 S.W.3d at 890, and the email exchanges helped to rebut Lozano's defensive theories by showing that a sexual relationship continued after the alleged offenses and undermined the possibility that A.L. could have fabricated the evidence given how many exchanges there were and given that they occurred on different dates, *see McCulloch*, 39 S.W.3d at 681. Further, the

19

evidence of a continuing relationship helped explain why A.L. did not report the abuse for several years. *See id.* at 682; *see also Brickley v. State*, 623 S.W.3d 68, 81 (Tex. App.—Austin 2021, pet. ref'd) (noting that evidence of "continuing course of conduct" can increase probative value of extraneous offense).

For these reasons, the trial court could have determined that the probative value of the exhibits strongly weighed in favor of admission.

*Potential to Impress Jury*

Turning to the potential for the evidence to impress the jury in some irrational way, Lozano asserts that the exhibits "tend to suggest decision on an improper basis—namely that there are some inappropriate, distasteful communications which are likely to inflame the jury" and persuade the jury to convict even though the communications "do not mean that Lozano committed the charged conduct when A.L. was under 17." On the contrary, Lozano asserts that many of the exhibits do not implicate a bad or wrong act on his part because they were just photos of A.L. in a bathing suit that she sent, that the communications took place after she turned seventeen years old, and that she initiated most of the communications.

Although Lozano contends that certain communications did not, on their own, establish a bad act and that the communications, with one exception, were sent after A.L. turned seventeen, they did help to establish, as set out above, the nature of the relationship between Lozano and A.L. and his state of mind. Consistent with that purpose, the trial court gave an oral instruction to the jury before A.L. testified about the emails directing the jury that it may consider evidence regarding extraneous acts only if the jury first found beyond a reasonable doubt that the acts occurred and then only for limited purposes, and the trial court included a similar instruction

20

in the jury charge. *See Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that "the impermissible inference can be minimized through a limiting instruction"); *Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd) (stating that appellate courts "presume that the jury obeyed" limiting instructions).

Further, the images and accompanying testimony did not address a complex subject matter that could have misled the jury because it was not properly equipped to consider the probative value. *See Gigliobianco*, 210 S.W.3d at 641. Additionally, even though the communications did contain images of A.L. in little or no clothing and showed an image of Lozano or another man masturbating, those actions were less "serious than the allegations forming the basis for the indictment" in this case. *See Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd); *see also Pawlak*, 420 S.W.3d at 810-11 (determining that admission of thousands of photos of pornography, including some that contained child pornography, should have been excluded under Rule 403 where it was not alleged that defendant participated in coercing children to be involved in making child pornography or that he assaulted children in photos).

Given the preceding, the trial court could have reasonably determined that the potential for the evidence to impress the jury in an irrational manner had been mitigated and that this factor weighed in favor of admission.

*Time Needed to Develop Evidence*

Regarding the time needed to develop the evidence, Lozano contends that this factor weighs against admission. Specifically, he notes that prior to the admission of the exhibits, A.L. testified about sexual activity that occurred after she turned seventeen when asked if certain incidents happened while she was a junior or senior or after she graduated. Further, Lozano asserts

21

that proving up the email communications present in the nineteen exhibits took up almost twenty pages of the record.

Although A.L. did testify prior to the admission of the exhibits regarding sexual activity that occurred after she turned seventeen years old, she did not testify regarding the email exchanges during that testimony. Further, we note that the guilt-innocence phase was held over three days and that the reporter's record for those days is nearly seven hundred pages in length but that the testimony regarding these emails is no more than twenty pages in length and that at the time of the trial court's ruling, no witness other than A.L. testified about the contents of the emails. *See Brickley*, 623 S.W.3d at 82 (determining that this factor weighed in favor of admission where testimony was five pages out of record spanning hundreds of pages); *Robisheaux*, 483 S.W.3d at 221 (finding this factor weighed in favor of admission where evidence regarding extraneous offense came in though one witness, where guilt-innocence phase lasted three days, and where testimony about extraneous offense "was only eight pages long").

Accordingly, the trial court could have reasonably concluded that the time factor weighed heavily in favor of admission.

*State's Need for Evidence*

In this issue, Lozano contends that the State's need for the evidence was low because the exhibits were not from the relevant time and did not prove that any offense occurred during the relevant time.

However, as discussed above, the email communications helped to explain the nature of the relationship between Lozano and A.L., Lozano's state of mind at the time of the alleged offenses, and A.L.'s delay in reporting the abuse and helped to rebut Lozano's defensive

22

theories that A.L. made up the allegations because she was angry with Lozano and fabricated evidence against him. *See Erazo v. State*, 144 S.W.3d 487, 495-96 (Tex. Crim. App. 2004) (noting that when assessing need for evidence, courts should consider whether "fact of consequence related to an issue that is in dispute"). The exhibits were offered during A.L.'s testimony, and prior to her testifying, the only evidence pertaining to the charged offenses was presented through the brief testimony of the SANE, who explained that A.L. had reported that Lozano began sexually abusing her when she was fifteen years old and that the abuse progressed to oral, vaginal, and anal penetration. *See Khoshayand*, 179 S.W.3d at 784. In her testimony, the SANE did not provide any additional details regarding the acts of penetration, including when they allegedly occurred. Moreover, there was no forensic evidence that a crime had occurred, and the SANE reported that A.L. refused an examination and that any examination would have been nonacute and would not have resulted in the collection of any evidence. *Cf. Brickley*, 623 S.W.3d at 82 (noting that no other witnesses discussed incidents of prior abuse before extraneous-offense evidence was offered).

Although one email exchange between Lozano and A.L. from when she was younger than seventeen was admitted at the same time as the exhibits listed above, that single exchange did not convey the nature of the relationship in the way that the other exhibits did. In the exchange, A.L. did send photos of herself in a bathing suit taken outside, but she was fully covered in the images. When responding to the message, Lozano simply stated, "All of them . . . Gorgeous. Your girlfriend took great shots of you." Accordingly, the trial court could have reasonably decided that the State needed the other exhibits to be admitted to help establish the nature of the relationship between the parties as well as their states of mind.

23

Considering the preceding, the trial court could have reasonably concluded that the State's need for the exhibits weighed in favor of admission.

Given our standard of review, the presumption in favor of admissibility, and the resolution of the factors above, we cannot conclude that the trial court abused its discretion by overruling Lozano's Rule 403 objection. *See id.* at 83; *see also Hammer*, 296 S.W.3d at 561-62 (explaining that sexual assault cases often are he-said, she-said cases and that Rule 403 "should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant in such 'he said, she said' cases").

**Admission of Exhibits 56 through 62**

In this issue, Lozano also contends that the trial court erred by overruling his Rule 403 objection and admitting State's exhibits 56 through 62.[7] Although Lozano challenges the

---

[7] The exhibits at issue in Lozano's second and third sets of arguments were admitted during A.L.'s testimony through two admissibility rulings that occurred after the trial court first admitted exhibits 30 and 33 through 55. Moreover, the contents of many of the messages in these next two groups of exhibits differed from those discussed in the previous section, and Lozano was the author of a larger proportion of the emails contained in these two sets of exhibits than in the communications from the exhibits discussed in the previous section. Additionally, during A.L.'s testimony, the trial court admitted other exhibits documenting additional communications between Lozano and A.L. from July 2020 to May 2021 that Lozano does not challenge on appeal. Despite the preceding, Lozano does not present any specific or tailored argument regarding how the trial court erred by admitting the exhibits at issue in his second and third set of arguments or refer to any case law. *See* Tex. R. App. P. 38.1(i) (setting out requirements for appellate briefs); *see also Burton v. Prince*, 577 S.W.3d 280, 292 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (noting that party must not only cite relevant authority and record but must also provide substantive legal analysis). Instead, Lozano states that he "incorporates by reference his 403 argument" from the previous set of arguments. *See Garrett v. State*, No. 05-99-00242-CR, 2000 WL 50063, at *4 (Tex. App.—Dallas Jan. 24, 2000, pet. ref'd) (op., not designated for publication) (overruling issue because issue "simply incorporates by reference appellant's prior arguments" in another issue); *Smith v. State*, 907 S.W.2d 522, 531-32 (Tex. Crim. App. 1995) (determining that issue was inadequately briefed for several reasons, including that argument section simply incorporated argument made for other points of error). Although it appears that the issues in these two sets of

24

admission of these exhibits in his third set of arguments, we address them before addressing the admission of the exhibits discussed in his second set of arguments because exhibits 56 to 62 were admitted first. Exhibits 56 to 60 are screen shots A.L. took of the email history between Lozano and her from April 2016 to July 2021 and show the sender, subject, and date of the messages but do not show the contents. Exhibits 61 and 62 show an email exchange between Lozano and A.L. from April 2017 in which she sent a photo of herself in a bathing suit and in which he responded "Are you gonna make me beg for the rest . . . , Ok then, pleeeeeeease." Later, when no additional photos were sent, Lozano replied, "Really! You suck then. . . Booooooo. I didn't want to see the other one anyway 😊. Ok. . . I understand." At the time of this exchange, A.L. had been seventeen for approximately one month.

*Probative Value*

As in the prior set of arguments, Lozano asserts that exhibits 56 through 62 did not prove a consequential fact. Those exhibits show the email history between Lozano and A.L. over a four-year period, including times when A.L. was younger than seventeen. Although the contents of the messages cannot be seen, the subjects of some of the emails match up with those admitted previously and similarly show that attachments were sent. Further, the history also documents that Lozano initiated many of the email communications between the two parties. Moreover, the significant number of communications was consistent with A.L.'s testimony that Lozano would communicate with her electronically to initiate sexual activity. Further, exhibits 61 and 62 depict an email exchange in which A.L. sent a photo of herself in a bathing suit right after turning

---

arguments may be inadequately briefed, we will address them in the interests of justice and endeavor to incorporate Lozano's contentions from his first set of arguments.

25

seventeen and in which Lozano responded by asking if she would make him beg for another photo before proceeding to beg. Accordingly, these exhibits were all relevant to Lozano's state of mind at the time of the alleged offenses and the nature of the relationship between Lozano and A.L. *See* Tex. Code Crim. Proc. art. 38.37, § 1(b); *see McCulloch*, 39 S.W.3d at 681; *Walker*, 4 S.W.3d at 103.

For these reasons, the trial court could have reasonably concluded that the probative value of this group of exhibits weighed in favor of admission.

*Potential to Impress Jury*

Lozano argues that these exhibits could inflame the jury by suggesting there were inappropriate communications between Lozano and A.L. even though most of the emails occurred after A.L. turned seventeen and even though the communications do not show a bad act because, according to him, the photos simply showed A.L. in a swimsuit. Exhibits 56 to 60 showed communications between Lozano and A.L. over a period of time but did not reveal the contents of the messages and were, therefore, unlikely to inflame the jury. Moreover, exhibits 61 and 62 did reveal the details of one exchange between Lozano and A.L. after she turned seventeen in which Lozano begged to see additional photos of A.L. However, the trial court had already provided an oral instruction to the jury informing them that they could only consider evidence of bad acts for limited purposes and only if the jury believed the acts occurred, and the trial court provided a similar instruction in the jury charge. *See Beam*, 447 S.W.3d at 405; *Gaytan*, 331 S.W.3d at 228. Moreover, these exhibits did not address a complex subject matter that might have potentially misled the jury, *see Gigliobianco*, 210 S.W.3d at 641, and the exhibits pertained to conduct

26

that was less serious than the sexual abuse for which Lozano had been charged, *Robisheaux*, 483 S.W.3d at 220.

Based on the above, the trial court could have reasonably decided that the potential for this evidence to improperly impress the jury had been sufficiently mitigated and that this factor weighed in favor of admission.

*Time Needed to Develop Evidence*

Lozano asserts that the time needed to develop exhibits 56 to 62 weighed in favor of excluding the exhibits. The portion of A.L.'s testimony discussing this set of exhibits is approximately four pages in length, and the exhibits themselves are only eight pages of the exhibit volume. And as set out above, the guilt-innocence phase of the trial was held over three days, and the reporter's record for that portion of the trial is hundreds of pages in length. *See Brickley*, 623 S.W.3d at 82; *Robisheaux*, 483 S.W.3d at 221.

Therefore, the trial court could have reasonably determined that the third factor weighed heavily in favor of admission.

*State's Need for Evidence*

Lozano contends that the State's need for exhibits 56 to 62 was minimal because the exhibits were from communications after A.L. turned seventeen and, therefore, could not establish than any crime occurred during the time alleged in the indictment.

As with the prior exhibits, these exhibits helped to explain the nature of the relationship between Lozano and A.L. Further, exhibits 61 and 62, which is an exchange over a photograph sent shortly after A.L. turned seventeen, helped establish Lozano's intent and state of mind when A.L. was younger than seventeen. *See Erazo*, 144 S.W.3d at 495-96. Moreover, as

discussed previously, no surveillance footage of the alleged crime or DNA evidence showed that sexual contact occurred. However, at the time that these exhibits were admitted into evidence, the exhibits discussed in Lozano's first set of arguments had been admitted, and A.L. had testified regarding the abuse. *See Khoshayand*, 179 S.W.3d at 784.

Accordingly, the trial court could have reasonably determined that this factor was neutral regarding admission or weighed slightly against admission.

Bearing in mind our standard of review, the presumption in favor of admissibility, and the resolution of the factors above, we cannot conclude that the trial court abused its discretion by overruling Lozano's Rule 403 objection. *See Hammer*, 296 S.W.3d at 561-62; *Brickley*, 623 S.W.3d at 83.

**Admission of Exhibits 51 through 55**

In his second set of arguments in his first issue, Lozano argues that the trial court erred by denying his Rule 403 objection and admitting State's exhibits 51 through 55 during A.L.'s testimony.[8] These exhibits were five email exchanges from Lozano to A.L. after A.L. moved out in June 2021. The first email was from June 2021 and was multiple pages in length. In the email, Lozano asked for another chance to make things right, promised to make A.L. feel loved, acknowledged his having taken from her, stated that he does not deserve her, expressed anguish at having lost her, and promised to just be a father to her. In the next two emails, also from June

---

[8] When the trial court admitted exhibits 51 to 55, it also admitted exhibit 121, which contained lengthy text messages from Lozano to A.L. in June 2021 in which Lozano expressed frustration with A.L.'s having moved out and not responding to his messages, apologized for how he treated her, and later warned not to "get to[o] ahead of yourself" about the claims she was making. Although exhibit 121 was admitted with the other exhibits, Lozano does not present any appellate claim regarding the admission of exhibit 121.

2021, Lozano begged A.L. not to leave him, to please let him know she was alright, and to come home. In an email from July 2021, Lozano stated that he was better off without her because she was bad for him and because she only cared for herself and loved "destruction." The final email was also from July 2021 and was multiple pages long. In the email, Lozano repeatedly apologized to A.L., referred to himself as "a life bully," said he regretted how he treated her, stated that he was "ashamed on levels" he could not explain, and expressed that she was better off without him.

*Probative Value*

In this set of arguments, Lozano asserts that these emails did not prove a consequential fact. However, this group of exhibits, like the last one, was relevant to showing Lozano's state of mind and the nature of the relationship between Lozano and A.L. *See* Tex. Code Crim. Proc. art. 38.37, § 1(b). Although these exhibits do not have the sexual images and language present in the first set of exhibits, they do contain statements evincing Lozano's shame and regret about what he had taken from A.L. and his promise to just be a father in the future. *See Chasco v. State*, 568 S.W.3d 254, 261 (Tex. App.—Amarillo 2019, pet. ref'd) (noting that defendant's apology to victim was evidence of consciousness of guilt). Moreover, unlike the first set of exhibits, these messages were communications entirely initiated by Lozano and sent after A.L. moved out of the home and no longer had access to Lozano's phone. Even though the email history from the second set of exhibits discussed above also showed communications initiated by Lozano after A.L. moved out, the contents of those messages were not displayed in the exhibits. Accordingly, the messages in exhibits 51 to 55 helped rebut Lozano's defensive theory that A.L. fabricated all the evidence against him when she had access to his phone. *See McCulloch*, 39 S.W.3d at 681.

29

Accordingly, the trial court could have reasonably concluded that the probative value of these messages strongly weighed in favor of admission.

*Potential to Impress the Jury*

Lozano argues that exhibits 51 to 55 had the potential to inflame the jury in an improper way because they pertained to distasteful communications between Lozano and A.L. that occurred after she turned seventeen and might have led the jury to rely on these communications to convict him of conduct occurring before she turned seventeen. However, this set of exhibits did not contain any photos from A.L. or responses by Lozano to A.L.'s photos, and his sending the types of messages present in the emails to A.L. after she turned seventeen was less serious misconduct than the offenses for which he had been charged. *See Robisheaux*, 483 S.W.3d at 220. Further, the exhibits did not address a subject matter than might have misled the jury. *See Gigliobianco*, 210 S.W.3d at 641. Furthermore, as discussed above, the trial court had already given an oral instruction limiting how the jury could consider evidence of other bad acts and provided a similar instruction in the jury charge. *See Beam*, 447 S.W.3d at 405; *Gaytan*, 331 S.W.3d at 228.

Accordingly, the trial court could have reasonably decided that the potential for the evidence to impress the jury in an improper way had been sufficiently mitigated and that this factor weighed in favor of admission.

*Time Needed to Develop Evidence*

In this set of arguments, Lozano contends that the time needed to develop the evidence pertaining to exhibits 51 to 55 weighed against admission. However, the portion of A.L.'s testimony discussing those exhibits constituted approximately five pages of her testimony.

30

Although two of the exhibits contain lengthy emails from Lozano to A.L., the specific contents of the emails were only briefly discussed. Moreover, as discussed above, the record in this case was hundreds of pages in length. *See Brickley*, 623 S.W.3d at 82; *Robisheaux*, 483 S.W.3d at 221.

Therefore, the trial court could have reasonably determined that the time factor weighed in favor of admission.

*State's Need for Evidence*

Lozano also argues that the State's need for exhibits 51 to 55 was not great because they were not from the time the criminal offenses allegedly occurred and could not prove that any offense occurred during the relevant period.

Prior to exhibits 51 to 55 being admitted, A.L. testified regarding the abuse, and the exhibits discussed above had already been admitted. Further, before exhibits 51 to 55 were admitted, the trial court admitted exhibits 70 to 120, which were text messages between Lozano and A.L. from July 2020 to May 2021, which was after A.L. turned seventeen but before she moved out. In those text messages, Lozano repeatedly tells A.L. to meet him in the garage or in other rooms in the house, to bring wine when she meets up with him, and to smoke marijuana with him. In one exchange, Lozano stated, "Get your soft supple, Amazingly beautiful practically perfect, way to[o] cute in a bathing suit, make a priest sin, ass self up! And good morning and I love u. Come to garage. K[h]akis gone. [Stepmother] is asleep. Time to shine." Additionally, he told her that they would "make a cute couple. A cute Couple of nasty asses! The naughty that would take place." Lozano also told A.L. to install an app on her phone that would allow them to "speak privately." In these exchanges, Lozano also stated that he could not meet up with her once because the security cameras on the house were down and because he would, therefore, not be able

31

to see if Stepmother came home early and expressed fear about being caught by Stepmother. When A.L. did not meet up with Lozano at his request or did not promptly respond to one of his text messages, Lozano expressed frustration and told her that he was tired of her excuses for not meeting up with him. During these exchanges, A.L. stated that she did not want to meet up one time because she was having her period, that they should meet in another room because the futon in the garage hurts her back, and that they should "come in the small room" rather than the garage.

Considering this evidence, the trial court could have reasonably concluded that the State's need for exhibits 51 to 55 to establish the nature of the relationship between Lozano and A.L. and his state of mind and intent at the time of the offenses was not great. However, other than the portions of exhibits 56 to 60 that showed communications between Lozano and A.L. after she moved out, all the other exhibits pertained to events allegedly occurring before A.L. moved out. And even the portions of exhibits 56 to 60 that showed communications after A.L. moved out did not show the contents of the actual messages between Lozano and A.L. Accordingly, the messages contained in exhibits 51 to 55 that were sent by Lozano to A.L. after she moved out and no longer had access to Lozano's phone helped rebut Lozano's defensive theory of fabrication. *See Erazo*, 144 S.W.3d at 495-96.

For these reasons, the trial court could have reasonably concluded that this factor was neutral regarding admission or weighed slightly in favor of admission.

Considering our standard of review, the presumption in favor of admissibility, and the resolution of the factors above, we cannot conclude that the trial court abused its discretion by overruling Lozano's Rule 403 objection. *See Hammer*, 296 S.W.3d at 561-62; *Brickley*, 623 S.W.3d at 83.

32

**State's Exhibit 65**

In his fourth set of arguments in his first issue, Lozano asserts that the trial court erred by overruling his Rule 403 objection and admitting into evidence State's exhibit 65 during the testimony of the digital forensic analyst who performed an extraction on Lozano's cellphone. *See* Tex. R. Evid. 403. The exhibit contained the search history from Lozano's phone from three days in August 2021 after A.L. had moved out. The history showed that the phone was used to access the same pornography website thirty-one times over the three days and accessed videos with search terms like the following: "daddy+cum+inside+me," "daddy+creampies+daughter," "fuck+me+daddy," and "father_and_daughter." Although the forensic analyst did not testify about most of the searches, he did testify that the history showed that the phone went to the website and then viewed a video with search terms "cute young nerdy tiny teen stepdaughter fucked by creepy stepdad."

*Probative Value*

In this issue, Lozano contends that the evidence had no probative value because the search history in 2021 did "not make it more or less probable that he committed the charged offense[s] in 2015 or 2016" and because the searches were performed after A.L. moved out of his home. Additionally, Lozano notes that there was no allegation that pornography was used during any of the alleged offenses or that Lozano and A.L. watched pornography together. Further, Lozano insists that the probative value was even further lessened by the fact that many of the searches were for pornography between people with a stepparent-stepchild relationship rather than a parent-child relationship.

Although Lozano correctly points out that many of the searches were for pornography between a stepparent and a stepchild, eighteen of the thirty-one videos had search terms like those listed above for pornography depicting a father and a daughter. Moreover, many of the searches conveyed that the daughter or stepdaughter was young or a teenager. These searches have probative value regarding the charged offenses because they bear on whether Lozano had the intent to engage in sexual conduct with A.L. *See Krause v. State*, 243 S.W.3d 95, 106 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (determining that photographs of defendant naked were "highly probative" of defendant's intent); *see also Mays v. State*, No. 05-21-01033-CR, 2023 WL 8014507, at *3 (Tex. App.—Dallas Nov. 20, 2023, pet. ref'd) (mem. op., not designated for publication) (concluding that evidence of defendant's internet search history showing "father/daughter pornographic searches" was admissible because it showed defendant's "intent or motive to arouse or gratify his sexual desire with his daughter").

Perhaps more importantly, by the time this exhibit was admitted, Lozano had presented his defensive theory through his opening statement and cross-examination of A.L. that A.L. had fabricated the sexually themed text messages and emails exchanged between their phones. *See Mays*, 2023 WL 8014507, at *1, *3 (determining that defendant's searches for father-daughter pornography were admissible to rebut defensive theory that child made up claims at behest of her mother). Accordingly, the searches found in exhibit 65, which were performed after A.L. moved out of Lozano's home and no longer had potential access to his phone, helped to rebut his defensive theory. *See Krause*, 243 S.W.3d at 106 (explaining that naked images of defendant on computer had probative value due to their tendency to rebut defensive theory that child pornography was placed on computer by someone else).

34

For these reasons, the trial court could have determined that the probative value of the search history weighed in favor of admission.

*Potential to Impress Jury*

Turning to the potential for the evidence to impress the jury in some irrational way, Lozano repeats his assertion that many of the searches were for individuals with a stepfamily relationship rather than a biological relationship. Lozano also suggests that the use of the words "teen" and "young" in some of the searches do not indicate whether anyone depicted in the pornographic videos was under the age of seventeen, and he asserts that without evidence that anyone depicted was under the age of seventeen, the searches have no relevance to any allegation in this case but are, according to him, highly prejudicial. Although Lozano acknowledges that the trial court provided a limiting instruction before the exhibit was admitted, he contends that the limiting instruction may have caused further prejudice in this case because it suggested that Lozano's searches were unlawful even though it was unclear whether Lozano was seeking child pornography or lawful pornography with what he describes as common descriptors like "daddy."

As an initial matter, we disagree with Lozano's characterization of the effect of the limiting instruction. Prior to the admission of the exhibit, the trial court informed the jury that "[t]he State will be introducing evidence of extraneous crimes or bad acts" and explained that the jury could only consider that evidence for limited purposes and only if it determined that Lozano "committed these acts, if any were committed." The trial court did not communicate that the exhibit in fact contained evidence of criminal behavior or that any entry in the exhibit contained evidence of criminal behavior and instead provided the limiting instruction to the extent that the jury might determine that the exhibit contained evidence of a crime or a bad act. Moreover, any

35

impermissible inference from evidence can generally be minimized through a limiting instruction like the one given here, *see Beam*, 447 S.W.3d at 405, and we must presume that the jury obeyed that instruction and the one in the jury charge, *Gaytan*, 331 S.W.3d at 228.

Further, although the exhibit and accompanying testimony related to pornography searches depicting family members engaged in sexual acts, no images or videos were admitted or shown, and the forensic analyst only discussed one of the searches in his testimony. Additionally, regardless of whether any video depicted a minor engaged in sexual activity, Lozano's having performed the internet searches at issue was a less serious act than the sexual abuse allegations for which Lozano was charged. *See Robisheaux*, 483 S.W.3d at 220; *see also* Tex. Penal Code § 43.26(d) (providing that possessing or accessing child pornography is, in general, third-degree felony). Furthermore, the exhibit and testimony did not address a complex subject matter that could have misled the jury because it was not properly equipped to consider the probative value. *See Gigliobianco*, 210 S.W.3d at 641.

Given the preceding, the trial court could have reasonably determined that the potential for this evidence to impress the jury in an irrational manner had been mitigated and that this factor weighed in favor of admission.

*Time Needed to Develop Evidence*

Regarding the time needed to develop the evidence, Lozano contends that this factor weighs against admission because the exhibit was eight pages long and because the testimony pertaining to the exhibit constituted approximately one third of the forensic analyst's testimony before the jury.

36

As set out earlier, the guilt-innocence phase was held over three days, and the reporter's record for that phase is almost seven hundred pages in length. But exhibit 65 was only eight pages in length, and the testimony concerning the exhibit spanned approximately only eight pages of the reporter's record even if it was a significant portion of the analyst's testimony. *See Brickley*, 623 S.W.3d at 82; *Robisheaux*, 483 S.W.3d at 221.

Accordingly, the trial court could have reasonably concluded that the time factor weighed heavily in favor of admission.

*State's Need for Evidence*

In this issue, Lozano contends that the State's need for the exhibit was low and that what the exhibit showed had little bearing on the allegations at issue.

As discussed earlier, Lozano presented through his opening statement and cross-examination of the State's witnesses his defensive theory that A.L. fabricated the email exchanges between them by accessing his phone. Accordingly, the State had some need for the evidence to show that Lozano expressed an interest in the type of sexual activity searched for after A.L. moved out of the house and no longer had any ability to access Lozano's phone. However, before exhibit 65 was admitted into evidence, the trial court admitted emails and text messages sent by Lozano to A.L. after she moved out that were consistent with the sexual relationship A.L. had testified about in that Lozano apologized for his behavior, promised to just be a father in the future, and seemingly threatened her regarding the claims that she was making, and the trial court also admitted text messages from Lozano to Stepmother sent after A.L. moved out in which he confirmed that A.L. had sent and that he had received images of her, including some in which she was naked. *See Khoshayand*, 179 S.W.3d at 784.

37

In light of the preceding, the trial court could have reasonably concluded that this factor was, at most, neutral regarding the admissibility of the exhibit.

Based on our resolution of the factors in this case and considering both our standard of review and the presumption in favor of admissibility, we conclude that the trial court did not abuse its discretion by overruling Lozano's Rule 403 objection. *See Hammer*, 296 S.W.3d at 561-62; *Brickley*, 623 S.W.3d at 83.

**Exhibit 123**

In the final set of arguments in his first issue, Lozano contends that the trial court abused its discretion by admitting into evidence exhibit 123 during the punishment phase. The exhibit was admitted through the testimony of Stepmother over Lozano's authentication objection. During a hearing outside the presence of the jury, the State explained that A.L. brought to the police station a purported recording of a conversation between Lozano and her and allowed one of the officers to make a copy of the recording and that the copy was the exhibit. At the beginning of the exhibit, the police officer told A.L. that he was just going to play her recording and make a copy of it on his device and stated the date and time that his recording was made before playing the recorded conversation. At the end of the clip, the officer stated that he had played the full approximately five-minute long clip and then stopped his recording. During the hearing, the trial court questioned the parties about whether they had a position on whether the portions containing the officer's voice should be excised, and although Lozano reasserted his prior authentication objection, he indicated that he did not think it was necessary to excise that portion "if [the officer is] not commenting on the substance of anything." After considering the parties' positions, the trial court determined that the officer's comments at the beginning and end of the recording did

38

not need to be removed because the officer was only identifying what the exhibit was. At the hearing, the trial court conditionally admitted the exhibit subject to the exhibit being sufficiently authenticated through Stepmother's testimony before it was played for the jury.

When discussing the exhibit, Stepmother explained that A.L. made a video recording of her on the phone with Lozano and sent Stepmother a copy of the recording that Stepmother watched. Stepmother also described the conversation as Lozano "threatening [A.L.] in the most unimaginable ways" and as A.L. visibly crying and reacting to the threats.[9] Additionally,

---

[9] For example, on the recording, the person identified as Lozano makes comments like the following:

> If you ain't willing to end it motherfucker, you do what the fuck I say in my motherfucking house or you can get the fuck out. Either way by your leaving or me leaving, this shit ends now. You fucking even dare to insult me one more fucking time by pulling your fucking dummy shit in this house, it is gonna end [A.L.]. Do you fucking understand that?

> Let me be a little more clear for you. I'll tell them myself you moron. I ain't a fucking pussy like you. But remember I said you don't know who you're messing with. And when I get to start lying? "I don't know. She just kept putting it in front of me. And I couldn't resist myself. I've been so hurt. She was playing on my emotions. My wife and me were having problems." You have no idea who you're fucking with. You think you're evil or conniving? Oh my God boogie, are you serious? You think you're a good liar motherfucker? You're an amateur at best. If you ever think about doing something fucking stupid, you better fucking know I don't play that shit. Remember I don't play fair dude. I go down, we all go down. That does mean you. Now you need to figure out what the fuck you want to do right now. If you're dumb enough. If you're stupid enough to want to test how crazy I am. If you want to bet I won't do shit? Are you fucking kidding? You are fucking delusional.

> You are fucking with a grown ass man that is just done being nice to you, you fucking cunt. You don't get to play stupid anymore with me motherfucker. You don't get to fucking run [racial expletive]. If you fucking run, *run all the way*.

> Are you motherfucking dumb? You are betting that because I love you that I won't fucking get you?

39

Stepmother testified that the exhibit contains the audio portion of the recording that was sent to her. Moreover, Stepmother specified that she could "unmistakably" identify Lozano's voice on the recording, that the female voice on the record was "[a]bsolutely" A.L.'s voice, and that she was familiar with how both Lozano and A.L. sound on the phone. Moreover, Stepmother testified that "to [her] knowledge," the recording had not been altered or changed in any way.

On appeal, Lozano notes that Stepmother did not make the recording, did not have any personal knowledge of its being made, and did not identify the police officer in her testimony. Further, Lozano highlights that neither the officer who made the audio recording nor A.L. testified about the recording. For these reasons, Lozano contends that the recording was not properly authenticated and that, therefore, the trial court erred by admitting it into evidence.

Appellate courts review a trial court's decision regarding the admission of evidence over an authentication objection under an abuse-of-discretion standard. *See Hunter v. State*, 513 S.W.3d 638, 640 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The authentication of evidence is a condition precedent to the admissibility of the evidence. *See* Tex. R. Evid. 901(a); *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Under the Rules of Evidence, the proponent must "make a threshold showing that would be 'sufficient to support a finding that the matter in question is what its proponent claims.'" *Tienda*, 358 S.W.3d at 638 (quoting Tex. R. Evid. 901(a)). Whether the proponent has crossed the evidentiary threshold is a preliminary determination for the trial court, but the jury must determine whether the "item of evidence is what its proponent claims." *Id.* "The preliminary question for the trial court to decide is simply

---

I have twenty years more practice at that shit than you. No matter how good you think you are, you got to know you are not in my league with this shit.

40

whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Id.* "Conclusive proof of authenticity before allowing admission of disputed evidence is not required." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). "If the trial court's ruling that a jury could reasonably find proffered evidence authentic is at least 'within the zone of reasonable disagreement,' a reviewing court should not interfere." *Id.* (quoting *Tienda*, 358 S.W.3d at 638); *see also Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (providing that appellate reviews of authentication determinations apply "liberal standard of admissibility").

"Rules of Evidence 901 and 902 govern the authentication requirement." *Jones v. State*, 572 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2019, no pet.). For evidence that is not self-authenticating, Rule 901 provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). Rule 901 sets out a non-exhaustive list of examples of the types of extrinsic evidence that will satisfy the authentication requirements. *Id.* R. 901(b). For example, regarding voices, Rule 901 allows evidence to be authenticated through "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." *Id.* R. 901(b)(5).

As an initial matter, we note that Lozano did not object to the lack of voice identification regarding the officer who made the exhibit by making an audio recording of the video made by A.L. and agreed that the officer's portion of the recording did not need to be excised. Therefore, any complaint now on this basis is waived. *See* Tex. R. App. P. 33.1 (setting out requirements for preserving claim for appellate review including making objection and obtaining

41

ruling on objection); *In re B.J.*, 100 S.W.3d 448, 451 (Tex. App.—Texarkana 2003, no pet.) (determining that appellate court did not need to address issue regarding lack of voice identification, in part, because defendant failed to object on that ground); *see also Jones v. State*, 80 S.W.3d 686, 688-89 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (involving allegation that audio tape was not properly authenticated because informant did not identify all voices on tape and concluding that court was "unwilling to read into the rule a requirement that each person, no matter how irrelevant to the case, be identified by name").

In any event, the exhibit was admitted for the conversation between Lozano and A.L., and Stepmother positively identified Lozano's and A.L.'s voices on the exhibit. *Cf. Escalona v. State*, No. 05-12-01418-CR, 2014 WL 1022330, at *8, *10 (Tex. App.—Dallas Feb. 20, 2014, pet. ref'd) (mem. op., not designated for publication) (concluding that recording was properly authenticated under Rule 901 by witness who was not on recording but had heard defendant's voice before). Moreover, Stepmother testified that A.L. previously made a video recording of a phone call between Lozano and A.L., that A.L. sent the recording to Stepmother, that Stepmother watched the recording, and that the exhibit was the audio component of the recording by A.L.

Accordingly, we conclude that the trial court did not abuse its discretion by concluding that the exhibit was sufficiently authenticated consistent with Rule of Evidence 901. *See* Tex. R. Evid. 901.

For all the reasons previously given, we overrule Lozano's first issue on appeal.

**Jury Charge**

In his second issue on appeal, Lozano contends that the jury charge in the guilt-innocence phase of trial improperly allowed the jury to convict him of conduct that occurred after

A.L. turned seventeen years old. Although Lozano acknowledges that he made no objection to the jury charge, he asserts that the error should still result in a reversal of his convictions because the error egregiously harmed him.

When addressing an issue regarding an alleged jury-charge error, appellate courts must first decide whether there is error before addressing whether the alleged error resulted in any harm. *See Thanh Cuong Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The amount of harm needed for a reversal depends on whether a complaint regarding "that error was preserved in the trial court." *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If no objection was made, as in this case, a reversal is warranted only if the error "resulted in 'egregious harm.'" *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

In reviewing a charge for alleged error, we examine the charge as a whole rather than as a series of isolated and unrelated statements. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). The charge must contain an accurate statement of the law and set out all the essential elements of the offense. *Id.*; Tex. Code Crim. Proc. art. 36.14. Jury charges contain both an abstract section and an application section. *See Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). The abstract paragraphs of a charge "serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Id.* The application paragraph is the portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the facts and indictment allegations of a given case. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015). The application portions allow the jury to convict a defendant of a particular offense. *Crenshaw*, 378 S.W.3d at 466.

As discussed previously, Lozano was charged with indecency with a child and sexual assault of a child, and the abstract and application portions of the charge contained instructions for those offenses. Regarding those offenses, the abstract section included instructions setting out the elements of the two offenses that were consistent with those listed in the statutes pertaining to those offenses. *See* Tex. Penal Code §§ 21.11, 22.011. Specifically, the abstract provided as follows:

> The defendant, Christian Lozano, stands charged by indictment in Count l with the offense of Indecency with a Child and in Counts 2, 4, and 6 with the offense of Sexual Assault of a Child.
>
> . . .
>
> A person commits the offense of Indecency with a Child if, with a child younger than l7 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person engages in sexual contact with the child.
>
> "Sexual contact" means any touching by a person, including touching through clothing, of any part of the genitals of a child, if committed with the intent to arouse or gratify the sexual desire of any person.
>
> A person commits the offense of Sexual Assault of a Child if, regardless of whether the person knows the age of the child at the time of the offense, the person intentionally or knowingly:
>
> > (A) causes the penetration of the sexual organ of a child by any means;
> >
> > (B) causes the penetration of the mouth of a child by the sexual organ of the actor;
> >
> > (C) causes the sexual organ of a child to contact the sexual organ of another person, including the actor.
>
> "Child" means a person younger than 17 years of age.

44

Additionally, the abstract portion included the following instructions regarding when the offenses occurred:

> The offenses charged are alleged to have been committed in Travis County, Texas, on or about the:
>
> > 1st day of August, 2015, in Count 1;
> >
> > 1st day of August, 2016, in Counts 2 and 4;
> >
> > 1st day of December, 2016, in Count 6.
>
> . . .
>
> You are further charged and instructed as the law in this case that the State is not required to prove the exact dates that have been alleged in the indictment.
>
> The State may prove that any of the four counts alleged to have been committed, were committed at any time prior to the presentment of this indictment, as there is no statute of limitations applicable to any of the four counts alleged to have been committed in the indictment.
>
> You are instructed that the indictment was presented on April 25, 2023.

The application portion of the charge contained a paragraph for each count setting out the allegations for each count and alleging that the offenses occurred on or about the dates listed above. Each paragraph also provided that the jury could only convict Lozano if it determined beyond a reasonable doubt that he engaged in the specific prohibited conduct against A.L. and if A.L. was then "a child younger than 17 years of age."

When asserting that there was error, Lozano notes that much of the evidence presented at trial concerned conduct that occurred after A.L. turned seventeen years old. After highlighting this evidence, Lozano asserts that the charge should have but did not have an instruction specifically limiting the period for which the jury could have convicted him to before A.L.'s seventeenth birthday. Further, Lozano suggests that the language in the abstract specifying

45

that the State did not have to prove the exact date on which the offenses were alleged to have occurred and that the State may prove that any of the offenses were committed at any time prior to the presentment of the indictment relieved the State of the burden of providing that the offense occurred before A.L. turned seventeen and authorized the jury to convict him of conduct that occurred after A.L. turned seventeen in 2017. For these reasons, Lozano asserts that there was error present in the charge due to the absence of an instruction pertaining to A.L.'s birthday that identified when A.L. turned seventeen.

We disagree. "It is a longstanding rule that the State is not required to prove that an offense was committed on the date alleged in the indictment (whether or not the words 'on or about' are used) but may prove that the offense was committed on any date prior to the return of the indictment and within the period of limitations." *Martin v. State*, 335 S.W.3d 867, 873 (Tex. App.—Austin 2011, pet. ref'd); *see Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997); *see also* Tex. Code Crim. Proc. art. 12.01(1)(B), (E) (providing that there is no statute of limitations for sexual assault of child and indecency with child). In fact, the Texas Pattern Jury Charges suggest including the instruction given in this case for cases involving indecency with a child and sexual assault of a child. *See* Comm'n on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Sexual Offenses* CPCJ 21.11, .19 (2023); *see also Markwell v. State*, 641 S.W.3d 530, 533 (Tex. App.—Austin 2022, pet. ref'd) (relying on pattern jury charges when overruling issue alleging jury-charge error).

Accordingly, "[i]t was not incorrect to instruct the jurors that . . . the State is not bound to prove the exact dates alleged in the indictment." *Martin*, 335 S.W.3d at 874. "In this case, for example, the State was not required to prove that" the offenses occurred on August 1, 2015; August 1, 2016; or December 1, 2016, as alleged in the indictment. *See id.* Although the

46

charge specified that the State could prove that any of the offenses occurred before the presentment of the indictment in August 2023, no error occurs "if the trial court's charge qualified the instruction regarding the nonbinding nature of the alleged dates by otherwise informing or requiring the jury to find that the" offenses occurred before A.L. turned seventeen. *See id.*

As set out above, the abstract provisions pertaining to indecency and sexual assault specified that those offenses occur only when the victim is younger than seventeen years old and defined the term "[c]hild" as someone younger than seventeen. Similarly, the application provisions specified that the jury could only convict Lozano if it determined that he engaged in the alleged sexual behavior and if A.L. was "a child younger than 17 years of age" at the time. Thus, although the charge specified that the State was not required to prove that the offenses occurred on the exact dates alleged in the indictment and that the conduct could have occurred any time before the indictment was presented, the charge provided the qualification that the alleged misconduct must have occurred before A.L. was seventeen, and A.L. testified when her birthday was and how old she was during her years in high school. Therefore, no error is present here. *See id.*; *see also Hall v. State*, No. 07-18-00166-CR, 2019 WL 81870, at *1, *2 (Tex. App.—Amarillo Jan. 2, 2019, pet. ref'd) (mem. op., not designated for publication) (rejecting claim that inclusion of instruction that State was not required to prove that offenses occurred on exact dates alleged in indictment and may prove that offenses occurred prior to filing of indictment "eliminated the element of the victim's age from the charge" by allowing jury to convict without determining that child was younger than fourteen or seventeen and explaining that jury charge, in its entirety, "properly instructed the jury on the nonbinding dates alleged in the indictment and required them to find that each offense occurred before [child] reached the applicable statutory age").

Having found no charge error, we need not address the issue of harm. For these reasons, we overrule Lozano's second issue on appeal.

**Cumulative Error and Harm**

In his final issue on appeal, Lozano contends that even if the errors alleged above did not constitute reversible error individually, the cumulative effect of the errors harmed him because, according to him, the jury likely convicted him based on conduct that occurred after A.L. was seventeen given the testimony and other evidence regarding acts occurring after A.L. turned seventeen and because, according to him, the jury charge allowed the jury to convict on the post-seventeen evidence.

However, because we have determined that the trial court did not abuse its discretion by admitting exhibits 30, 33 through 62, 65, and 123 and that there was no error in the jury charge, we cannot find cumulative harm. *See Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) (explaining that non-errors do not, in their cumulative effect, cause harm); *see also Ruffins v. State*, 691 S.W.3d 166, 188-89 (Tex. App.—Austin 2024, no pet.) (holding that there was no cumulative harm where appellate court determined that either no error occurred in issues raised by defendant or that he failed to preserve those claims).

Accordingly, we overrule Lozano's third issue on appeal.

**CONCLUSION**

Having overruled all of Lozano's issues on appeal, we affirm the trial court's judgments of conviction.

48

_____

Thomas J. Baker, Justice

Before Justices Baker, Smith, and Theofanis

Affirmed

Filed:   October 18, 2024

Publish